# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

OURBUS, INC.

                          Plaintiff,             Civil Action No.
                                                 3:19-CV-0356 (DEP)
        v.

CITY OF ITHACA, NEW YORK,
*et al.*,

                          Defendant.

_____

<u>APPEARANCES</u>:                  <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

LAW OFFICE OF               STEVEN A. DIAZ, ESQ.
STEVEN A. DIAZ
2200 Pennsylvania Avenue, NW
Fourth Floor, East Tower
Washington, DC 20037

RIVKIN RADLER LLP         JAMES P. LAGIOS, ESQ.
9 Thurlow Terrace           MARK J. WAGNER, JR., ESQ.
Albany, NY 12203

HUGHES LAW OFFICE        LAWRENCE F. HUGHES, ESQ.
42-65 Kissena Blvd., Suite 609
Flushing, NY 11355-3267

<u>FOR DEFENDANT</u>:

SMITH, SOVIK, KENDRICK     EDWARD J. SMITH, III, ESQ.
& SUGNET, P.C.             KAREN G. FELTER, ESQ.
250 S. Clinton Street, Suite 600   DAVID M. KATZ, ESQ.
Syracuse, NY 13202

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## DECISION AND ORDER

Plaintiff OurBus, Inc. ("OurBus" or "plaintiff") is a broker engaged in arranging for the transportation of passengers, including to and from Ithaca, New York, utilizing the services of federally-registered motor carriers. OurBus has commenced this action against defendant City of Ithaca ("City") and various City officials and employees, alleging that, *inter alia*, through enactment and implementation of an ordinance adopted by its Common Council, the City has unlawfully restricted access by OurBus, for purposes of dropping off and picking up passengers, to a bus stop previously utilized by buses engaged by the company. Plaintiff argues that through its actions, the City has unlawfully discriminated against OurBus and placed an undue burden upon interstate commerce, and that the ordinance at issue is preempted by a federal law governing interstate motor carriers.

Currently pending before the court is an application by OurBus for a temporary restraining order and preliminary injunction precluding the City from enforcing the ordinance and denying plaintiff access to the pick-up and drop-off point previously utilized under color of the ordinance.

Because OurBus has failed to demonstrate either a likelihood of success on the merits of its claims or that it will suffer irreparable harm if an injunction is not issued in its favor, and further based upon my finding that the issuance of an injunction would not serve the public's interest, plaintiff's motion is denied. The following constitutes my findings of fact and conclusions of law.

I.    BACKGROUND

A.    City of Ithaca

The City of Ithaca is located in Upstate New York, and within the Northern District of New York. Two large collegiate institutions, Cornell University and Ithaca College, are located within the limits of the City. Evidentiary Hearing Transcript ("Tr.") 222. While the City's population numbers approximately thirty thousand people, that number doubles when students are present at those two institutions. Tr. 222-23. One witness described the City as "unique" with its "challenging" topography, hills, small intersections, and narrow residential streets. Tr. 222.

Several different bus companies operate within the City. The Tompkins Consolidated Area Transit ("TCAT"), a not-for-profit organization that is partially owned by the City, provides local transit services to both the City and the surrounding areas of Tompkins County. Tr. 15, 110. The

City is also serviced by several privately-owned motor carriers of passengers that provide intercity service, including Greyhound Lines, Inc. ("Greyhound"), Passenger Bus Corporation ("New York Trailways"); and Chenango Valley Bus Lines, Inc. ("ShortLine" or "Coach USA") (collectively, the "Legacy Carriers"). Tr. 23, 33. In addition to TCAT and the Legacy Carriers, OurBus, a broker of passenger transportation, provides intercity services to the City.

    B.    <u>OurBus</u>

OurBus is a Delaware corporation formed in 2016 and headquartered in New York City. Tr. 6. According to company's co-founder, Axel Hellman, OurBus is a "transportation technology company," engaged in the business of brokering passenger transportation by bus to and from various locations, with regular stops in New York, Massachusetts, Connecticut, Pennsylvania, Maryland, and the District of Columbia. Tr. 6, 8. It appears that at least initially, and during the relevant time period, OurBus provided service for a single route from the City to New York City and back. Exh. P-1 at 4. That route is interstate, since it traverses through Pennsylvania and New Jersey. Tr. 8.

Because it is a broker of transportation services, rather than a federally-registered motor carrier, OurBus neither owns any buses nor

controls any of the motor carriers with whom it contracts. Tr. 6-8. Rather, the function of OurBus is to connect passengers seeking transportation with motor carriers registered with the Federal Motor Carrier Safety Administration ("FMCSA") to provide that transportation. Tr. 6-8. The services offered by OurBus include route planning, marketing, customer service, and ticket sales. Tr. 7.

When OurBus sells tickets to passengers, it submits a portion of the fees collected to the motor carrier providing that transportation and then realizes, as a gross profit, the difference between the fares paid by the passengers and the fees remitted to the motor carrier. Dkt. No 2-1 at 2-3. Officials for the City agree that "OurBus is valuable to the City" because it provides a low cost transportation option, particularly to its large student population. Tr. 329.

Unlike the Legacy Carriers, OurBus does not utilize a paper ticketing system.[1] Tr. 36. Instead, passengers can purchase electronic tickets through the OurBus website or a mobile application. Tr. 9. Each electronic

---

[1]     On May 7, 2019, OurBus submitted a reply to the City's opposition to its motion for a preliminary injunction, in which it indicated that the Green Street Pharmacy would commence "sell[ing] tickets for the motor carriers brokered by OurBus" on May 10, 2019, although it is not entirely clear from those papers whether what is reference would be physical ticket sales—like the Legacy Carriers—or merely an extension of the company's electronic ticketing platform. *Compare* Dkt. No. 34-1 at 9 *with* Tr. 7 ("OurBus sells tickets on our website and our mobile app.").

ticket issued displays the name of the motor carrier assigned, as well as the Department of Transportation ("DOT") and Motor Carrier ("MC") numbers of the bus to be utilized for the route. Tr. 11. Although OurBus utilizes the services of a range of different motor carriers to provide transportation to its customer base, it relies primarily upon three motor carriers: (1) Hampton Jitney of Calverton, Long Island, (2) Martz Trailways of Pennsylvania,[2] and (3) Field Trips 101, which does business as Fitzgerald Brothers of Geneva, New York. Tr. 45-46.

C.    <u>Section 346-31 of the City of Ithaca Municipal Code</u>

In March 2001, the City's Common Council enacted section 346-31 of the City of Ithaca Municipal Code as part of an overall scheme to promote traffic control, eliminate traffic congestion, and ensure the safety of passengers and pedestrians in and around the streets of the City. *See generally* Dkt. No. 30-4. In relevant part, that section provides as follows:

> Unless otherwise provided to the contrary, no bus or common carrier, whether for hire or not, shall be operated upon, stop on or stand on any City street in the corporate limits of the City of Ithaca, nor shall such bus or common carrier pick up or discharge passengers on any such City street or curb, or any other public property, or at or within 200 feet of any City bus stop in said corporate limits of the City of

---

[2]    This company appears to be part of a larger Martz Group, operated by First Class Coach Company, Inc. from St. Petersburg, Florida. *See, e.g.*, Exh. P-1 at 5.

> Ithaca, unless a permit is obtained therefor from the Common Council of the City of Ithaca, or its designee, the issuance of which permit shall be at the sole discretion of the Common Council of the City of Ithaca.

City of Ithaca Municipal Code § 346-31(A).

Historically, section 346-31 was not construed as requiring the Legacy Carriers to obtain a permit because although they "operated upon" the City's streets, those companies utilized a then-existing, privately-owned bus terminal to embark and disembark passengers. Exh. P-8 at 4-5; *see infra* Point II.E. Accordingly, the Legacy Carriers "did not pose the same potential hazards contemplated by the Code[,] including traffic congestion, interruption of passage of emergency vehicles, and disruption of public bus stops." Exh. P-8 at 4. Likewise, the ordinance was not historically construed as applying to TCAT because that entity "functions as the City's public transit system." *Id.* at 5; *see also* Tr. 135.

D.  131 East Green Street and the Initial OurBus Permit

At the center of this dispute is an intercity bus stop, located partially along the frontage of 131 East Green Street and in front of an Urban Outfitters storefront. Tr. 28-29, 229-30. That bus stop is located in a congested area in the heart of the City, and in close proximity to "The Commons," a pedestrian zone that is closed to vehicular traffic

(hereinafter, the "pedestrian mall"). Tr. 14, 25, 223. The bus stop, labeled

Ⓐ, and surrounding area are generally depicted on the following map:[3]



East Green Street, which is immediately south of the pedestrian mall, and

East Seneca Street, which is immediately north of the pedestrian mall,

together form a portion of New York State Route 79, an east-west state

---

3       At the hearing, the court invited counsel for the parties to jointly agree upon and submit a map depicting the relevant area for the aid of the reader. Tr. 218-20. Unfortunately, while the map provided by the parties is partially helpful to orient the reader, it fails to provide specific detail regarding the buildings and businesses that exist in and around the 131 East Green Street bus stop. *Compare* Exh. P-13, *with* Exh. P-4.

highway that represents a main thoroughfare in and out of the City. Tr. 107. East Green is an eastbound, one-way street, while East Seneca Street is a westbound, one-way street. Tr. 26, 56, 155-56.

As it is presently configured, two full-size motor coaches can fit within the bus stop at 131 East Green Street, although the City initially and incorrectly believed that the space was capable of accommodating three buses.[4] Tr. 27, 73, 140, 144, 335. East Green Street does not currently have a bicycle lane, although once construction on East Green Street ends, which is anticipated for August of this year, a five-foot wide bicycle lane will be restored between the driving lanes of the street and the bus stop at 131 East Green Street. Tr. 73, 142. Once this bicycle lane reopens, the space at 131 East Green Street will not be able to accommodate more than one bus at a time. Tr. 73, 140-41, 144, 335.

There are several businesses in the immediate vicinity of the 131 East Green Street bus stop, which as will be seen, create unique challenges for the area. To the immediate east of the bus stop is a mental health facility, which is labeled on the map as ④. Tr. 35-36 (citing Exh. P-13). While it does not appear that the facility has adjacent parking for its

---

[4]     The buses utilized by TCAT are shorter than the full-size motor coaches utilized by the Legacy Carriers and OurBus. Tr. 141, 167-68.

patrons, it does have a curb cut that is utilized for the pick up and drop off of patients. Tr. 36. The facility is immediately adjacent to the "Tioga Street stub," an area that permits emergency vehicles direct access to the facility, and is used by Gadabout, a private bus service, to drop off and pick up patients visiting the mental health center. Tr. 36, 118, 227.

To the immediate west of the 131 East Green Street bus stop are the Tompkins County Library, labeled as ②, and the Green Street Pharmacy, which is not labeled. Tr. 35, 189. In front of the library and pharmacy—and immediately west of 131 East Green Street bus stop—is one of two TCAT bus stops—labeled as Ⓑ, and which brings

approximately 1,160 TCAT buses to East Green Street per week. Exh. P-8 at 9.

In the fall of 2017, OurBus applied for a permit pursuant to section 346-31 of the City of Ithaca Municipal Code. Tr. 12; Exh. P-1. Specifically, OurBus sought—with one limited exception—permission to embark and disembark passengers at 131 East Green Street.[5] Exh. P-1. In response

---

[5] OurBus sought the use of 201 East Green Street for a route that picked up passengers on Fridays at 5:00 p.m. Exh. P-1. In addition, OurBus requested the use of 201 East Green Street and South Cayuga Street as secondary, alternative bus stops in the event that its first and preferred choice, 131 East Green Street, was not approved for use by the City. Exh. P-1.

to a question on the application concerning who would be operating the bus, the permit application responded, "Operated by First Class Coach Company, DOT #278100, MC #194130."[6] Exh. P-1; *see* Tr. 13, 160-61. In addition, the application also indicated that the proposed bus stop location was within two hundred feet of TCAT bus stop.[7] Tr. 14; Exh. P-1. Included with the permit application was a proposed schedule of operations, as well as a certificate of liability insurance in favor of First Class Coach Company, and which named the City as a "certificate holder." Exh. P-1.

On January 3, 2018, the City's Common Council passed a resolution authorizing the issuance of a permit to OurBus "to operate a Charter Bus within the City of Ithaca." Tr. 20-21; Exh. D-1, Exh. P-8 at 8; *see also* Exh. P-1 at 9 ("Attached is your approved application for operations in [the City]."). That resolution provided that the permit was subject to the following conditions:

---

[6]     Although OurBus has repeatedly suggested that its application was "very clear" that OurBus was not a motor carrier—but a broker of transportation services—by virtue of the responses that it provided on the permit application, *see* Tr. 12; Exh. P-1, that fact was not apparent to the City until sometime in the Fall of 2018 and possibly in to early 2019. Tr. 170-71; Dkt. No. 30-3 at 7; Dkt. No. 2-9 ("There may be some confusion as to the relationship between OurBus, Inc. and the motor carriers, and the legal duties of each.").

[7]     Axel Hellman testified that the interconnectivity of the intercity and local transit services is an "extremely important" feature of his company's operations because the proximity of the service provides means by which passengers can reach the end points of their destinations. Tr. 14-15; *see also* Tr. 234.

1. The exact route, locations where passengers may be dropped off and picked up, and times of operation shall be subject to approval by the Superintendent of Public Works or his designee;

2. Said charter bus shall be operated on a pre-arranged basis only, with tickets having been purchased in advance by passengers;

3. The operator(s) of the bus shall at all times ensure that the bus is not parked in a manner that interferes with the ability of emergency vehicles to move or pass or sight distance for pedestrians or motorists;

4. Permittee shall at all times maintain valid liability insurance coverage, as well as present the City Attorney's Office with proof of compliance with the New York Workers' Compensation Law

Exh. D-1. OurBus did not raise any objections to these conditions. *See generally* Exh. P-1 at 14.

At the time OurBus applied for its first permit, only one other intercity bus company, Big Red Bullet—a luxury charter bus company that also provided direct service between the City and New York City—was operating at the 131 East Green Street bus stop.[8]  Tr. 18; *see also* Exh. P-9 at 6. Nonetheless, from the time OurBus was issued this permit in

---

[8] Big Red Bullet's operations ceased at some point shortly following a fatal accident in October 2018. Tr. 177; Exh. P-8 at 6.

January 2018 until approximately October 2018, OurBus and Big Red Bullet operated without any significant incidents from the subject bus stop. Tr. 19, 138, 314-15; Exh. P-8 at 8; *see also* Dkt. No. 30-31 at 3 ("From my conversations with bus drivers over the last few weeks, Big Red Bullet and OurBus have been able to share this space effectively for some time[.]")

### E. Closure of the Private Bus Terminal and the Six-Month "Trial Period"

#### 1. The Loss of the Private Bus Terminal

In June or July of 2018, the City learned that the privately-owned bus terminal, located at 710 West State Street and which had been used for some length of time by the Legacy Carriers, would close effective September 1, 2018. Tr. 33-34, 98, 132-33, 314; Exh. P-8 at 8. According to Joann Cornish, the Director of Planning and Development for the City, although all of the companies were asked to provide their schedules so that the City could identify potential problems, a more formal study was not undertaken to find a suitable, alternative location for the Legacy Carriers to utilize because the City "had three weeks" to find a solution. Tr. 97-98, 103-04, 171-72, 314.

In light of the limited and challenging real estate in the City, 131 East Green Street was ultimately selected as the logical location for the Legacy

Carriers to relocate.[9] Tr. 99-100, 109-10, 221-22, 315-22; *see also* Dkt. No. 30-11. Accordingly, on September 5, 2018, the Common Council approved a resolution allowing the Legacy Carriers to utilize 131 East Green Street for a six-month trial period. Exh. P-8 at 10; *see* Dkt. No. 30-11.

When the first full week of operations at 131 East Green Street commenced on October 1, 2018, a number of issues and concerns arose, particularly during peak usage times. Tr. 21, 71, 102-103, 117, 163, 323; Exh. P-5; Exh. P-8 at 13. As was described by Ms. Cornish,

> [d]uring those busy weekends with students, we have multiple buses, some of them taking up a lane of traffic. We have operators using the luggage in traffic, where they put the luggage for the -- for their passengers, they're in the lane of traffic.

---

[9] In the short period of time that officials from the City had to locate an acceptable alternative location for the three Legacy Carriers, it considered several additional sites in addition to 131 East Green Street. Tr. 136-37; *see also* Tr. 250-60; *see also* Exh. D-26. The City considered and rejected a space in front of the Breckinridge apartment building based upon the potential interference with the ability of the residents of the building to load and unload in front of the building. Tr. 73, 252-54, 281-82; *see* Exh. D-26. A location in front of the Tompkins Trust Company, was also rejected due to its proximity to the bank, as well as concerns regarding the loss of on-street parking spaces. Tr. 74, 255-57, 282-83; *see* Exh. D-26. A location on West State Street was ultimately rejected because it was more difficult for buses to get to and the road was not sufficiently wide to accommodate driving lanes and a bus stop. Tr. 257-58; *see* Exh. D-26. In addition, a fourth location, on North Geneva Street, was also considered, but rejected, since it was situated in a residential area and near a church and the location was not deemed appropriate for the gathering of bus passengers. Tr. 258-60; *see* Exh. D-26; *see also* Tr. 104-09, 136-37.

> The pedestrians fill the sidewalk. Green Street
> Pharmacy people can't get in their door. The mental
> health building . . .
>
> . . . .
>
> . . . . The mental health building has registered
> concern that their clients who may have some
> mental health issues are afraid of crowds and can't
> get through.

Tr. 117-18; *see also* Tr. 119-20; Exh. P-8 at 13. Moreover, because

several buses were vying for limited space, the City encountered buses

obstructing the Tioga Street stub, effectively blocking emergency vehicle

access. Tr. 118; *see generally* Exh. P-5.

These issues were readily apparent when the City's Common

Council met on November 7, 2018. *See generally* Dkt. No. 30-17. At that

time, officials "revoked all of the previously issued permits[.]" Tr. 21; *see*

*also* Dkt. No. 30-17 (November 7, 2018 Common Council proceedings). In

addition, the City's Common Council approved a resolution that

established a "permit fee" of five dollars per arrival and departure for use

of the bus stop located at 131 East Green Street as a way to offset the

cost of more than $200,000 for necessary infrastructure changes that

would be required to make the location a viable long-term bus stop. Tr. 81,

246; Dkt. No. 30-17; Exh. P-8 at 14. At that meeting, when an alderperson

"stressed the importance of having set bus schedules at the beginning of

the year vs. the flexibility model proposed so the bus companies can make scheduling changes as needed," another alderperson responded that the "Common Council's role [was] to regulate how many buses can be on the street at the same time, not to set bus schedules." Dkt. No. 30-17 at 4; *see also id.* ("[S]cheduling buses is a means of promoting public safety.").

In light of the revocation of the prior permits, the City asked "all the previous permittees to apply for new permits[.]" Tr. 21, 74; *see* Exh. P-6 at 2. The City further requested that any company that wished to continue its operations at the 131 East Green Street bus station return a new "bus permit agreement" with the appropriate fee and insurance information by November 21, 2018. Tr. 21, 81; Exh. P-6 at 2, 7.

## 2. OurBus and the Non-Renewal of its Permit

In anticipation of the new fee structure, on September 26, 2018, Krin Flaherty, Esq., an Assistant City Corporation Counsel for the City, provided new proposed permit agreements to impacted companies, including OurBus. Dkt. No. 30-30 at 2 (citing Dkt. No. 30-31); *see also* Tr. 74. The new permit form agreement included a number of new conditions, and according to Attorney Flaherty:

> OurBus's proposed new permit agreement included
> terms and conditions regarding imposition of a fee
> for use of the East Green Street location,
> revocability of the permit, the requirement to comply

with a permitted schedule (Attachment "A" to the
agreement) and submit schedule changes for
review and approval. The agreements also required
submission of proof of insurance.

Dkt. No. 30-30 at 2 (citing Dkt. No. 30-31 at 6-12) (internal citations

omitted). In particular, one paragraph provided:

The approved schedule attached as Schedule A is
valid for the Permit period. Upon payment of $500,
Permittee may submit proposed changes to the
approved schedule for review and approval by the
City Transportation Engineer. In no event shall
Permitee request changes to the approved
schedule more than once per six months

Dkt. No. 30-31 at 6, ¶ 2.

Through its counsel, Lawrence Hughes, Esq., OurBus responded

and raised a number of objections to the proposed permit, primarily to any

reference to OurBus being a motor carrier, rather than a broker. Exh. D-5

at 3-5; Tr. 75-76, 78. Attorney Hughes also noted that the permit language

regarding scheduling was "problematic, unfair, and unworkable," because

the OurBus business model required it to respond quickly to market

conditions, and suggested that the City was attempting to impermissibly

regulate bus schedules in contravention of federal law. Exh. D-5 at 5.

Attorney Flaherty incorporated some, but not all, of the language

proposed by OurBus into a new, redlined draft agreement that she

provided to counsel for OurBus on October 3, 2018. Exh. P-9 at 3; *see*

*also* Exh. D-5; Dkt. No. 30-34 (first draft); Tr. 80. "However, the City required OurBus otherwise to comply with the terms of the [proposed] permit, e.g., committing to its permitted schedule, paying the required fee, submitting schedule changes in advance for approval[,] and assuming liability for the actions of its operators." Exh. P-9 at 3. In providing the first draft to OurBus, Attorney Flaherty also advised that "[a]s to your last point regarding regulation of scheduling, the City is not exercising any control over OurBus' schedule. Rather, as owner of the property, the City is managing the effective and safe use of its property." Exh. D-5 at 3.

On October 5, 2018, OurBus responded and indicated that it "disagree[d] with the city's conclusion that it would not be regulating the schedules of motor carriers of passengers subject to federal jurisdiction through the intended use of its permit system, and that it "believe[d] that federal law would not support that conclusion." Exh. D-5 at 2. There was no further negotiation regarding permit language, and the November 21, 2018 deadline passed without the parties having reached agreement. Tr. 81-84; *see also* Exh. D-5. Following the passage of the deadline, Attorney Flaherty notified OurBus (among others) of the following:

> You are receiving this notice because the City has not received an executed agreement or permit fee from your company. As such, you and any employees, agents, representatives, or

18

> subcontractors of your company are hereby
> prohibited from using the Green Street inter-city bus
> space, effective immediately. The City reserves all
> rights to restrict use of [131 East Green Street], and
> intends to enforce by any and all means available
> under the law.
>
> We encourage all unpermitted operators and
> providers to secure other arrangements on privately
> owned land for pick up and drop off passengers.

Exh. D-7; *see also* Dkt. No. 30-37; Tr. 83-84.

In response to this notification, Mr. Hellman requested the status of

the "edits" demanded by OurBus. Exh. D-8; Tr. 84. Attorney Flaherty

responded by providing Mr. Hellman with the last version that had been

approved by the City. Exh. D-8; Dkt. No. 30-39 (second draft). Mr. Hellman

then provided another version, signed by OurBus, and which "included

additional terms not discussed with or accepted by the City, most notably,

'[OurBus] does not control any motor carrier operations, and makes no

promises that any motor carrier or its employees will comply with any

permit terms or conditions.' " Exh. P-9 at 5 (citing Exh. D-8 at 5-9 (third

draft)); Tr. 87-88.

By e-mail dated December 5, 2018, Attorney Flaherty stated as

follows:

> I regret to inform you that the City will not
> grant a permit to OurBus for use of the Green Street
> location.

Over the course of the last two months, City staff have evaluated use of this space as an inter-city bus stop. The functional limitations of the space make it so that the City cannot accommodate all companies intending to use the Green Street location, and have required the City to adopt a first-come, first-serve approach to issuance of permits.

OurBus has been included in multiple e-mails concerning the permit process and relevant deadlines, and has failed to deliver an agreement or permit fee within the deadlines specified. Companies operating under a permit have submitted a permit agreement within the City's specified deadlines and agreed to pay the fee in a timely fashion. OurBus has done neither, and as such, the City is not authorizing OurBus' use of the Green Street location.

We encourage you to make arrangements with privately owned locations for passenger pick up and drop off within the City and/or surrounding areas.

Exh. D-9.

Despite having previously tendered a *third* proposed draft of the permit to the City via e-mail on November 30, 2018, Mr. Hellman responded to this e-mail and indicated that an executed version of the *second* draft had been mailed—along with a check for $1,500—to the City on November 30, 2018, an amount which, according to Attorney Flaherty,

was insufficient to defray the fees owing through March 31, 2019.[10] Exh. D-9; Exh. P-9 at 5-6. As a result, by letter dated January 18, 2019, Attorney Flaherty advised OurBus that it was being prohibited from using the 131 East Green Street location "effective immediately" because: (1) it had failed to submit the required payment or agreement in a timely manner, and (2) the City had "documented examples" of carriers utilized by OurBus loading luggage from the street side of buses. Exh. D-10; Tr. 90-91; *see also* Tr. 228-30; Exh. D-18.

In an e-mail dated January 29, 2019, Mr. Hellman responded and indicated that OurBus would be tendering the additional money owed to the City. Exh. D-4. In addition, he emphasized that OurBus had no control over the motor carriers that it utilized, but he would "pass along" the City's safety concerns. Exh. D-4.

Upon receiving an additional $3,700 from OurBus, Attorney Flaherty responded in writing on February 20, 2018, accepting the payment and advising that OurBus could continue to use 131 East Green Street intercity bus stop through March 31, 2019. Exh. D-11. That letter advised,

---

[10] The second draft version, purportedly signed by OurBus on November 30, 2018 reflected that the "Use Fee" for OurBus from October 1, 2018 through March 31, 2019 was $1,500. However, in the second draft provided by the City, the "use Fee" had been left blank. *Compare* Dkt. No. 30-39 at 4 *with* Exh. D-9 at 7.

however, that due to the space constraints and the bus schedules, OurBus could not any longer be accommodated at that location and would be prohibited, effective April 1, 2019, from using the intercity bus space.[11] Exh. D-11. The letter advised that it constituted notice to the effect that the City would not renew the OurBus permit for the next 2018-2020 term to utilize the 131 East Green Street intercity bus space. Exh. D-11. As a reason for reaching a determination, the letter succinctly stated the following: "[D]ue to OurBus number of scheduled arrivals and departures combined with the functional limitations of the space, the City finds that OurBus cannot be accommodated at this location at this time." Exh. D-11.

F.     The City's Decision for Non-Renewal at 131 East Green Street

The decision to rescind the second OurBus permit for 131 East Green Street at the conclusion of the six-month trial period was made jointly by Eric Hathaway, the Office of the Corporation Council, and the City's Common Council following a number of meetings with various officials.[12]  Tr. 184-85, 233-41; *see* Exh. D-20. According to Mr. Hathaway,

---

[11]     Based upon a stipulation by the parties, that deadline for OurBus to cease operations at 131 East Green Street has been extended until June 29, 2019. *See* Tr. 91.

[12]     Apparently unaware that by that time its operations had already ceased, Mr. Hathaway also recommended that the permit for use by Big Red Bullet of the 131 East Green Street stop be rescinded. Tr. 184-85.

his reasoning for making the recommendation was multifaceted and based on a number of interrelated considerations with respect to why the space at 131 East Green Street was not a viable long-term solution. *See generally* Dkt. No. D-20; Tr. 168-203. One factor considered was that buses stopping at 131 East Green Street were often observed to be loading and unloading luggage on the street side of the bus. Tr. 228-30, 275-78; Exh. D-18. Although this situation was not limited to buses brokered by OurBus, when all of the companies utilizing the stop were advised of the safety concerns, OurBus responded that it could not control the operation of its engaged motor carriers as a broker. Tr. 228-32; Exhs. D-4, D-18.

Another consideration was the fact that with four companies utilizing 131 East Green Street, the area was significantly congested; a situation that was exacerbated during peak travel times. Tr. 236-37; Exh. D-20; *see* Exh. P-5. Concomitantly, this congestion resulted in a dangerous situation for patrons of the area, including for those patients attempting to utilize the mental health facility. Tr. 236-38; Exh. D-20.

Hathaway was also concerned about the lack of a fixed and predictable schedule by OurBus, as distinct from the Legacy Carriers utilizing 131 East Green Street. Tr. 174-78. Unlike the Legacy Carriers,

which provided—and adhered—to fixed schedules of arrivals and departures throughout their operation, the schedule for OurBus was more demand-oriented, with the company providing additional services and routes particularly in peak seasons of student travel, such as over Thanksgiving and Christmas breaks. Tr. 93, 174-78, 309-10, 325-28, 334; *see* Exh. D-12. By way of one example, on March 29, 2019, which was the Friday before spring break for the local colleges, OurBus was scheduled to operate ten buses according to the information provided to the city, but actually brokered for operators to conduct twenty scheduled charters that day from Ithaca. Tr. 175-76, 247-48; Exh. D-23. The fluctuations of OurBus schedules—particularly in combination with the company's failure to notify City representatives of those changes, despite having been made aware of this obligation as early as 2017[13]—made it difficult to coordinate and ensure safe operation of the limited space at 131 East Green Street.

Mr. Hathaway was also concerned about the impending restoration of the bike lane, which would result in the space only being able to

---

[13]    Mr. Hellman conceded that OurBus "did not write to the [City]" when the company experienced a schedule change, but testified that "the information was available on our website." Tr. 70. However, when OurBus completed its initial permit application in 2017, Mr. Hellman specifically asked, "Going forward[,] would schedule changes have to be reviewed by the [C]ity?" Exh. P-1 at 14. Mr. Hathway responded affirmatively that "[s]chedule changes should be sent to the City for review and approval." *Id.*

accommodate one bus at a time. Tr. 238. With its current configuration, once the bike lane is restored, even contemporaneous use of the stop by two buses will likely result in one of the two buses protruding into the bicycle lane, as was evidenced by the CAD drawing received in evidence at the hearing. Exh. D-13. Given the inability of OurBus to provide an indication of a firm schedule, the schedules of all of the carriers utilizing the 131 East Green Street stop cannot be adjusted in order to ensure that no more than two buses at any single time are stopped at the Urban Outfitters location.[14]

Finally, Mr. Hathaway also based his recommendation upon the fact that the Legacy Carriers utilize the Green Street Pharmacy near that location to sell physical tickets, whereas OurBus does not.[15] Tr. 184-85, 239-42; Exh. D-20.

---

[14] During peak travel times, the Legacy Carriers sometimes add additional buses, or "sections," to their scheduled routes in order to accommodate an influx of students and other passengers coming and going. Tr. 41-47, 145-46. It does not appear that City officials, including Transportation Engineer Hathaway, have yet considered or addressed the additional congestion caused by the addition of such sections.

[15] To the extent that OurBus indicates that it too sells papers tickets at the Green Street Pharmacy, as noted in footnote 2, *ante*, this was not set to commence until May 10, 2019—after the nonrenewal decision had been made—and is in some contrast to the testimony of Mr. Hellman. *Compare* Dkt. No. 34-1 at 9 *with* Tr. 7 ("OurBus sells tickets on our website and our mobile app.").

Shortly following the non-renewal decision, Jennifer Kusznir, an employee of the City's Planning and Economic Development Division, spoke with Mr. Hellman by telephone regarding the City's decision. Tr. 359-61; Exh. D-22. Although she indicated to him that the decision not to renew the permit was, in part, the result of OurBus being the "last to submit [the] permit fee," she further noted that their flexible schedule made it difficult to accommodate the company at 131 East Green Street. Tr. 359-61; Exh. D-22. During that call, Mr. Hellman indicated that OurBus was considering "applying for a permit to load/unload on South Cayuga Street[,]" although to date this does not appear to have come to fruition. Exh. D-22; *see* Tr. 360.

G.  Consideration of Other Sites for Use by OurBus

In or about March of 2019, the City identified a location on East Seneca Street as a possible alternative site for a bus stop.[16] Tr. 266-67, 329-30. This location, which is directly in front of a Starbucks storefront and currently designated as a no-parking zone, would be in close proximity to the pedestrian mall, as well as the second of two TCAT bus

---

[16]     During a conversation with Mr. Hellman, held on March 21, 2019, Ms. Kusznir suggested that OurBus consider exploring the nearby Hotel Ithaca parking lot as a suitable bus stop location. Tr. 359-60.

stops.[17] Tr. 266; Exh. P-13. According to Eric Hathaway, the Transportation Engineer for the City, this location is acceptable "for one bus at a time," meaning "a provider that does not plan to have more than one bus at a time could use that space." Tr. 270-71, 286-87; *see also* Tr. 22 ("[B]ut 99 percent of the time, yes, there's only one bus brokered by OurBus present.").

Because the location identified on East Seneca Street is not currently an approved location for a bus stop within the City, it would require recommendations and approvals from different officials from the City. Tr. 269. However, the location had been initially identified by the City's Mayor's Office as a feasible option, and had been approved by the City's Planning and Development Department. Tr. 266-69, 289, 291, 345. Moreover, it was represented that the City's Engineering and Economic Development Departments had also agreed the site was acceptable. Tr. 568. It was noted that the City's Corporation Counsel had not offered an opinion on the location, and that approval was still required from the Board of Public Works and the City's Common Council. Tr. 268-69, 288, 300.

---

[17]     As noted in footnote 8, *ante*, the interconnectivity offered by situating intercity bus stops near those utilized by local transit is an important factor to the business model of OurBus.

Despite the lack of all necessary approvals from the City, the East Seneca Street location was discussed at a meeting held on April 4, 2019. Although it is not entirely clear to the court who proposed East Seneca Street as a viable alternative, nor is it necessarily relevant to the resolution of the matter, according to Ms. Kusznir, OurBus indicated they would not leave the location on 131 East Green Street because "they were there first and . . . they should be allowed to stay there." Tr. 331; *see also* Tr. 291; *cf.* Tr. 33 (indicating that the City did not ever suggest "an alternative location").

Unfortunately, to date, the parties have not reached agreement concerning the use of the East Seneca Street or any other location as a bus stop. In addition, based on the present record, OurBus has stalwartly adhered to its position that it can only operate from 131 East Green Street, despite having requested the use of 201 East Green Street and South Cayuga Street as alternatives in its initial permit application in the fall of 2017. Exh. P-1. Based upon the present record, it appears that OurBus has not undertaken any efforts to submit a permit application for any alternative locations, and has likewise refused to consider operating from private property.

## II.  PROCEDURAL HISTORY

OurBus commenced this action on March 21, 2019, alleging seven separate causes of action against the City, including (1) violation of 42 U.S.C. § 1983 under the Commerce Clause to the United States Constitution, alleging undue burden upon interstate commerce, discrimination against interstate commerce, preemption, denial of the use of the streets for transportation, and denial of a permit (counts one through five, respectively), (2) a claim under 42 U.S.C. § 1988 for the recovery of attorney's fees (count six); and (3) a cause of action under the Equal Protection Clause of the New York State Constitution (count seven). Dkt. No. 1.

At the same time the action was commenced, plaintiff also moved for a temporary restraining order and preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Dkt. No. 2. In its motion, OurBus specifically seeks an order restraining and enjoining the City from engaging in the following conduct during the pendency of this action:

> (1)  Enforcement of the ordinance against and denying the use of the East Green Street by motor carriers of passengers brokered by OurBus;
>
> (2)  Disrupting or interfering with operations of OurBus' business as a broker for motor carriers of passengers; and

29

> > (3) From taking any action adverse or detrimental
> > to OurBus' business interest.

*See* Dkt. No. 2-13 at 1. On May 1, 2019, the City simultaneously moved to dismiss the complaint, in its entirety, and responded in opposition to plaintiff's motion. Dkt. Nos. 29, 30.

On May 22, 2019, OurBus filed an amended complaint in the action as a matter of right, pursuant to Rules 15(a) and 21 of the Federal Rules of Civil Procedure. Dkt. No. 59. Although additional parties were added in the amended complaint, the request for injunctive relief remained unchanged and, therefore, the filing of that new pleading did not affect the pending motion notwithstanding the City's request that plaintiff be directed to file an amended motion for injunctive relief. Dkt. No. 60. The City acknowledged that by filing the amended complaint, its motion dismiss was rendered moot, Dkt. No. 60, and by text order dated May 24, 2019, Senior District Judge Thomas J. McAvoy denied the City's pending motion to dismiss on that basis. Dkt. No. 64. On June 14, 2019, defendants filed their answer to plaintiff's amended complaint. Dkt. No. 69.

Although the motion for a temporary restraining order and preliminary injunction was initially referred to me by Senior District Judge McAvoy for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b)(1)(B) and Federal Rules of Civil Procedure 72(b), the parties have since consented to my jurisdiction pursuant to 28 U.S.C. § 636(c). *See* Dkt. Nos. 24, 67. An evidentiary hearing was conducted on May 10, 2019, and continued to May 15, 2019. At the conclusion of the hearing, decision was reserved, and a schedule for post-hearing filings was set.

III.   DISCUSSION

A.   Preliminary Issues

Prior to addressing the merits of plaintiff's motion for preliminary injunctive relief, I must resolve several outstanding issues that have arisen between the parties.

1.   Rule 408 Evidence

During the course of the evidentiary hearing, OurBus strenuously objected to the introduction of evidence offered by the City to show that a location on East Seneca Street had been considered and offered to OurBus as an alternative bus stop location. *See, e.g.*, Tr. 203-06. Plaintiff argued that consideration of that evidence would violate Rule 408 of the Federal Rules of Evidence in that the testimony disclosed discussions aimed toward resolution of the dispute and pending litigation. *Id.*

"In furtherance of the public policy of encouraging settlements and avoiding wasteful litigation, Rule 408 bars the admission of *most* evidence of offers of compromise and settlement." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) (emphasis added); *see* Fed. R. Evid. 408 advisory committee note; *see also* 2 Weinstein's Federal Evidence § 408.09. In relevant part, the rule provides that

> [e]vidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> (1)   furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2)   conduct or a statement made during compromise negotiations about the claim[.]

Fed. R. Evid. 408.

The bar provided by Rule 408, however, is not absolute. "The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b). Accordingly, evidence of an offer in compromise, "though

otherwise barred by Rule 408, can fall outside the [scope of the] Rule if it is offered for 'another purpose,' *i.e.*, for a purpose other than to prove or disprove the validity of the claims that [the agreement was] meant to settle." *Trebor Sportswear Co*, 865 F.2d at 510; *see Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999). The "another purpose" exception is clearly intended to exempt "evidence focused on issues different from the elements of the primary claim in dispute." *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 114 (2d Cir. 2008)

A determination of whether an offer in compromise falls within the protections of Rule 408 is matter exclusively for the court pursuant to Federal Rule of Evidence 104(a), and the trial judge is vested with "broad discretion as to whether to admit evidence of settlement . . . offered for 'another purpose.' " *Trebor Sportswear*, 865 F.2d at 511; *see Martin-Trigona v. Meister*, 760 F.2d 1334, 1344 (2d Cir. 1985). In applying the "another purpose" exception, "the [trial judge] should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Trebor Sportswear*, 865 F.2d at 510-11 (quoting 2 J. Weinstein & M. Berger, *Weinstein's* Federal Evidence § 408(05) (1988)).

Although it is clear that Rule 408(a)(1) renders evidence of settlement discussions inadmissible when used to support or dispute "the

validity or amount of a disputed claim," several courts have determined that when that evidence is offered to oppose the contention that a party will suffer irreparable harm in the absence of a preliminary injunction, it falls squarely within the "another purpose" exception. In *Kotori Designs, LLC v. Living Well Spending Less, Inc.*, No. 16-CV-637, 2016 WL 6833004 (M.D. Fla. Nov. 21, 2016), a trademark infringement action, for example, the plaintiff, who sold the "Livewell Planner," sought a preliminary injunction to prohibit the defendant from selling the "Living Well Planner." *Id.* at *1. Prior to commencing the action, the plaintiff proposed a settlement by which, *inter alia*, the defendant could "sell, *as-is*, the new planners [the defendant] had already printed for an additional five months[.]" *Id.* at *3 (emphasis in original). The court noted that "the specific terms of [the p]laintiff's settlement offer are wholly inconsistent with—and therefore fatal to—a claim of imminent irreparable harm, absent an injunction." *Id.*; *see also id.* at *3 n.8 (citing *BitTitan, Inc. v. SkyKick, Inc.*, No. 15-CV-0754, 2015 WL 5081130, at *8 n.3 (W.D. Wash. Aug. 27, 2015); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2011 WL 7036077, at *40 n.39 (N.D. Cal. Dec. 2, 2011), *aff'd in part, vacated in part on other grounds, remanded*, 678 F.3d 1314 (Fed. Cir. 2012)); *see Sarieddine v. D and A Distribution, LLC*, No. 17-CV-2390, 2017 WL

6940537, at *3 (C.D. Cal. Jul. 13, 2017); *but see Complex Systems, Inc. v. ABN AMRO Bank N.V.*, No. 08-CV- 7497, 2014 WL 1883474, at *19 n.19 (S.D.N.Y. May 9, 2014) (concluding that evidence of settlement offers "fall plainly under Rule 408" in the context of a permanent injunction).

Even if a court were to conclude that an offer in compromise falls plainly within the protections afforded by Rule 408—because such evidence is being offered to "prove or disprove the validity or amount of a disputed claim," Fed. R. Evid. 408—this does not necessarily mean that it is excluded from the court's consideration in the context of a party's request for preliminary injunctive relief. Indeed, the Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also* 11A Fed. Prac. & Proc. Civ. § 2949 (3d ed.) ("[T]he trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be had."); *Kennedy for and on Behalf of N.L.R.B. v. Sheet Metal Workers Int'l Ass'n Local 108*, 289 F. Supp. 65, 90-91 (C.D. Cal. 1968). Although the Second Circuit has not addressed whether evidence otherwise

precluded by Rule 408 can be considered in the context of a request for a preliminary injunctive relief, it has nonetheless determined "that hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (citing, *inter alia, Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) (noting that courts, at the preliminary injunction stage, "may rely on otherwise inadmissible evidence, including hearsay evidence.")). It follows that a "court may, in its discretion, consider inadmissible evidence on a motion for a preliminary injunction." *Talarico v. Excellus Health Plan, Inc.*, No. 14-CV-1058, 2015 WL 2122176, at *3 (N.D.N.Y. May 6, 2015) (Suddaby, C.J.).

Based upon the foregoing, I conclude that evidence regarding the parties' efforts to reach a resolution is relevant, particularly with respect to the issue of irreparable harm, and its admission does not run afoul of Rule 408. As a result, the objection by OurBus to the admission and consideration of evidence of efforts to find an alternative location for use by OurBus is overruled.

2. <u>Standing</u>

In their opposition to the pending preliminary injunction motion, defendants question plaintiff's standing to challenge section 346-31 of the

City of Ithaca Municipal Code, arguing that it is not a "permissible permitee" under the City's ordinance. Dkt. No. 30-45 at 12-13. "In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Arising from the case and controversy requirement of Article III of the Constitution, "[i]n essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see also Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013). As the Second Circuit has noted, "standing is to be determined as of the commencement of suit." *Fenstermaker v. Obama*, 354 F. App'x 452, 355 n.1 (2d Cir. 2009) (summary order) (quoting *Lujan v. Defenders of Wild Life*, 504 U.S. 555, 571 n.5 (1992)).

The standing requirement is reflective of "an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178-79 (D.C. Cir. 1983) (internal quotation marks omitted). The Supreme

Court has observed that the three elements of standing "are (1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision." *Virginia House of Delegates v. Bethune-Hill*, No. 18-281, 2019 WL 2493922, at *3 (U.S. Jun. 17, 2019) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). Undeniably, to qualify for the issuance of a preliminary injunction, the plaintiff must establish standing to raise the claims set forth in its complaint.

In this instance, I find that plaintiff has alleged the existence of a concrete and particularized injury in fact sufficient to bestow standing upon it under Article III case in controversy provision. The focus of the City's standing argument is that the ordinance at issue only governs "bus[es] or common carrier[s,]" and since OurBus has repeatedly and emphatically indicated that it is merely a "broker" under federal law, it has not suffered the requisite injury to permit it to prove the claims in its amended complaint. Dkt. No. 30-45 at 12-13. The ordinance, however, speaks of prohibiting, *inter alia*, buses and common carriers from embarking and disembarking passengers within the City unless a permit is obtained from the City's Common Council. *See* City of Ithaca Municipal Code § 346-

31(A). The ordinance does not otherwise define buses or common carriers.

Although OurBus is not a federally-registered motor carrier, it is nonetheless the broker of such motor carriers—or buses—and at least arguably within the intended purview of the permit. Since prohibiting buses that are engaged by OurBus from utilizing a stop within the City would have a direct financial impact upon OurBus in terms of lost profits, the company possesses the requisite standing to prove its claims.

OurBus maintains that when it applied for its permit, it was doing so on behalf of the motor carriers with which the company works. Even if OurBus, as a broker, was not within the purview of the permit, the ordinance nonetheless does not specify who may apply for the permit or whether the conduct by OurBus, in assigning its permit rights to the motor carrier, is impermissible. *See* City of Ithaca Municipal Code § 346-31(A). Moreover, the permit application itself intimates that it may be someone other a motor carrier who applies for the permit. Exh. P-1. Otherwise, the eighth question, which seeks information concerning the operator of the bus, would be redundant. Exh. P-1. If the intent was to limit permit seekers to federally-registered motor carriers, the application form would instead simply ask for the DOT and/or MC number associated with the permit

applicant. Additionally, by issuing at least two permits in its favor—at least one of which was granted when the City was aware of the business model of OurBus as a broker—the City has itself interpreted the ordinance to apply to OurBus, and has since threatened to curtail the company's conduct under the permit.

I therefore conclude that OurBus has demonstrated the existence of an injury in fact sufficient to establish standing.

B.    <u>Plaintiff's Motion for Preliminary Injunctive Relief</u>

1.    <u>Standard of Review - Generally</u>

In this circuit, a party seeking a preliminary injunction must establish three elements, including (1) that it will suffer irreparable harm unless an injunction is granted; (2) either a likelihood of success on the merits or both serious questions regarding the merits and a balance of hardships tipping decidedly in favor of the moving party; and (3) that the issuance of a preliminary injunction would be in the public interest. *N. Am. Soccer, LLC v. United States Soccer Federation, Inc.*, 883 F.3d 32 (2d Cir. 2018); *Hafez v. City of Schenectady,* No. 17-CV-0219, 2017 WL 6387692, at *3 (N.D.N.Y. Sept. 11, 2017) (Suddaby, C.J.). " 'When, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme,

the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.' " *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (quoting *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008)).

The purpose of a preliminary injunction is to preserve the status quo pending resolution of any underlying dispute. *Chobani LLC v. Dannon Co., Inc.*, 57 F. Supp. 3d 190, 201 (N.D.N.Y. 2016) (Hurd, J.). Since the issuance of a preliminary injunction is "an extraordinary remedy," the party seeking an injunction must demonstrate "by a clear showing" that the necessary elements for its issuance have been satisfied. *In re Keurig Green Mountain Single-serve Coffee Antitrust Litigation*, No. 14-MD-2542, 2014 WL 12778832, at *4 (S.D.N.Y. Sept. 19, 2014); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

While the foregoing standard applies to prohibitory injunctions, intended to maintain the status quo pending disposition of a case, the City argues that what is being sought actually constitutes a mandatory injunction, which would result in alteration of the status quo. Dkt. No. 66 at 24-25. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or

substantial likelihood of success on the merits.' " *N. Am. Soccer, LLC*, 883 F.3d at 37 (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)).

Central to the question of whether the injunction sought by OurBus is prohibitory, or instead mandatory, is the question of what is the status quo. For purposes of injunctive relief, the status quo is defined as " 'the last actual, peaceable uncontested status which preceded the pending controversy.' " *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (quoting *LaRouche v. Keizer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994)); *see also N. Am. Soccer, LLC*, 883 F.3d at 37. In simple terms, "[t]he status quo is the parties' pre-controversy position vis-à-vis the other." *N. Am. Soccer, LLC*, 883 F.3d at 38 (footnote omitted).

In this case, the initial permit authorizing the use of the bus stop was revoked by the City, Tr. 21, with OurBus ultimately executing a permit that contained an automatic renewal provision, subject to a number of conditions.[18] Dkt. No. 30-39 at 5. Although the City elected to exercise its

---

[18]    In relevant part, the portion of the second permit stated, in relevant part:

> This Bus Permit shall commence upon execution, and expire March 31, 2019. This Bus Permit shall renew automatically thereafter, for one-year terms, with the same terms and conditions (except that the amount of the Use Fee may be revised annually), provided that Permittee has submitted to City any required renewal forms, proof of insurance and the

right of non-renewal, OurBus has been allowed to continue to use 131 East Green Street since that time, despite not having complied with a number of conditions that would have otherwise resulted in the automatic renewal of the permit. Since the decision by the City to rescind the permit is the action currently being challenged, the status quo would seemingly constitue the relationship between the parties prior to implementation of the decision to rescind, including the continued use of the intercity bus stop located at 131 East Green Street by OurBus. *See, e.g.*, Dkt. No. 2 at 4.

Based on the unique circumstances of this matter, whether the injunction sought by OurBus is prohibitory or mandatory presents an exceedingly close call. Although I am inclined to conclude that the heightened standard associated with a mandatory injunction need not be applied in this case, and that OurBus is seeking a prohibitory injunction, as will be seen, under either standard, OurBus has not met its burden.

    2.    <u>Federal Preemption and the Likelihood of Success on the Merits</u>

---

full and proper applicable fee for the renewal period, before the commencement of such new term (i.e., before April 1st), and provided that the City has <u>not</u> notified Permittee, by March 1st, of the City's intention <u>not</u> to renew for the following permit year.

Dkt. No. 30-39 at 5.

The claims of OurBus in this case hinge primarily upon the assertion that the City's actions to enact and enforce section 346-31 of the City of Ithaca Municipal Code are based upon a municipal ordinance that is preempted by federal law. *See generally* Dkt. No. 59.

Under the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are " 'without effect.' " *Altria Group, Inc. v. Good*, 555 U.S. 70 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *see* U.S. Const. art. VI, cl. 2; *see also N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103-04 (2d Cir. 2010). As a result, the Supremacy Clause effectively " 'invalidates state laws that interfere with, or are contrary to federal law.' " *Millennium Pipeline Co., L.L.C. v. Seggos*, 288 F. Supp. 3d 530, 544 (N.D.N.Y. 2017) (quoting *Bonilla v. Semple*, No. 15-CV-1614, 2016 WL 4582038, *5 (D. Conn. Sept. 1, 2016)).

Preemption can either be express or implied. *See Steel Inst. of N.Y. v. City of New York*, 716 F.3d 31, 36 (2d Cir. 2013). There are three distinct types of preemption:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local

> law conflicts with federal law such that it is
> impossible for a party to comply with both or the
> local law is an obstacle to the achievement of
> federal objectives.

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir.

2010) (quoting *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir.

2005)); *see English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).

The touchstone of the preemption inquiry is congressional intent.

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "Where Congress legislates in

an area that is within the states' traditional police powers, intent to preempt

the field will ordinarily not be inferred unless such intent is 'clear and

manifest.' " *New York Pet Welfare Ass'n, Inc. v. City of New York*, 850

F.3d 79, 89 (2d Cir.), *cert. denied sub nom. New York Pet Welfare Ass'n,*

*Inc. v. City of New York, N.Y.*, 138 S. Ct. 131 (2017) (quoting *English v.*

*Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). Thus, the court must " 'start with

the assumption that the historic police powers of the States were not to be

superseded by the Federal Act unless that was the clear and manifest

purpose of Congress.' " *City of Columbus v. Ours Garage & Wrecker*

*Serv., Inc.*, 536 U.S. 424, 432 (2002) (quoting *Wisconsin Pub. Intervenor*

*v. Mortier*, 501 U.S. 597, 605 (1991)). This is often referred to as the

"presumption against preemption," which recognizes a "rebuttable

presumption against the preemption of the states' exercise of their historic

police power to regulate safety matters." *Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses*, 634 F.3d 206, 210 (2d Cir. 2011).

Because the parties do not contend that this case involves implied preemption, the court must focus on the express preemptive language contained in The Interstate Commerce Act, as amended by the Federal Aviation Administration Authorization Act of 1994, 108 Stat. 1606, and the ICC Termination Act of 1995, 109 Stat. 899. As one court aptly observed, however, the statutory scheme now before the court, "along with its various amendments is an excellent example of poor legislative draftsmanship, filled with exceptions, exemptions, and cross-references." *Greyhound Lines, Inc. v. City of New Orleans ex rel. Dep't of Pub. Utils.*, 29 F. Supp. 2d 339, 342 (E.D. La. 1998) (citing *426 Bloomfield Ave. Corp. v. City of Newark*, 904 F. Supp. 364, 368 (D.N.J. 1995) ("Unfortunately, the Interstate Commerce Act consists of a complex web of exceptions, exemptions and cross-references which must be parsed through both individually and collectively.")). Despite the complexity created through the enactment and amendment of the relevant statute, the Second Circuit has observed that the present statutory scheme "generally preempts state and

local regulation." *Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136, 142 (2d Cir. 2006) (Sotomayor, J.).

Preliminarily, I note that the parties do not even agree on the precise portion of the statutory section that governs the preemption analysis. Plaintiff appears to contend that 49 U.S.C. § 14501(a)(1) and (b)(1) both apply, while defendant has suggested at one point during the proceedings that the court's analysis should be guided by 49 U.S.C. § 14505. *Compare* Dkt. No. 65 at 28 *with* Dkt. No. 30-45 at 14; *but see* Dkt. No. 66 at 2-3 (arguing that the ordinance "is not within the preemption language of 49 U.S.C. § 14501."). At this early stage of the proceedings, I conclude that plaintiff has properly invoked and relies upon 49 U.S.C. § 14501(a)(1).[19]

Section 14501, which is captioned "[f]ederal authority over intrastate transportation," contains an express preemption provision, which indicates that states and their political subdivisions may not enforce rules affecting

---

[19] As the City has observed, 49 U.S.C. § 14501(b)(1) applies to "intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker." Dkt. No. 66 at 18. Plaintiff has suggested that the reference to "intrastate" rather than "interstate" is the result of a simple scrivener's error. Dkt. No. 65 at 28. Based upon the plain language of the statute, the court disagrees with plaintiff's interpretation. *See, e.g.*, *Factory Mut. Ins. Co. v. One Source Logistics, LLC*, No. 16-CV-6385, 2017 WL 2608867, at *5 (C.D. Cal. May 5, 2017) (concluding that "plain language" applies to intrastate rates, routes and services).

interstate or intrastate transportation by a motor carrier[20] of passengers,
with certain, identified exceptions. *See* 49 U.S.C. § 14501(a).[21] The
principal question next becomes the extent to which the Ithaca City Code
is saved from preemption by the language contained in section

---

[20]   "The term 'motor carrier' means a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

[21]   In its entirety, that section provides:

> **(a) Motor carriers of passengers.--**
>
> > (**1**) **Limitation on State law.**--No State or political subdivision thereof and no interstate agency or other political agency of 2 or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to--
> >
> > > (A) scheduling of interstate or intrastate transportation (including discontinuance or reduction in the level of service) provided by a motor carrier of passengers subject to jurisdiction under subchapter I of chapter 135 of this title on an interstate route;
> > >
> > > (B) the implementation of any change in the rates for such transportation or for any charter transportation except to the extent that notice, not in excess of 30 days, of changes in schedules may be required; or
> > >
> > > (C) the authority to provide intrastate or interstate charter bus transportation.

49 U.S.C. § 14501(a)(1).

14501(a)(2), which preserves the "safety regulatory authority of a State with respect to motor vehicles[.]"[22]  49 U.S.C. § 14501(a)(2).

In *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, the Supreme Court interpreted a safety exception contained in 49 U.S.C. § 14501(c), which is nearly identical to the one contained in 49 U.S.C. § 14501(a)(2).[23]  In that case, the Court noted that the clear purpose of

---

[22]     That the City of Ithaca is a municipal entity, rather than a "State," makes no difference in the court's analysis of the present claims. The congressional "reference to the 'regulatory authority of a State' should be read to preserve, not preempt, the traditional prerogative of the States to delegate their authority to their constituent parts." *Ours Garage and Wrecker Service, Inc.*, 536 U.S. at 429. Under the New York Constitution, home-rule cities such as the City of Ithaca "have [the] power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government[.]" N.Y. Const., Art. IX, § 2.

[23]     The structure of section 14501(c)'s is parallel to section 14501(a), in that it contains a general preemption rule and an exception. Specifically, it provides:

> **(c) Motor Carriers of Property.**--
>
> > **(1) General Rule.**-- ... a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or another provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property.
> >
> > (**2**) **Matters Not Covered.**—Paragraph (1)--
> > (A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, [among other things] . . . .

49 U.S.C. 14501(c). In *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489 (5th Cir. 2017), the Fifth Circuit affirmed the district court's determination that " ' other decisions interpreting and applying [section] 14501(c)(2)(A) may appropriately be considered in interpreting and applying [section] 14501(a)(2), as both subsections use identical language.' " *Id.* at 494; *see Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("Undoubtedly, there is a natural presumption that identical

Congress was "to ensure that its preemption of States' economic authority . . . [and] 'not restrict' the preexisting and traditional state police power over safety." *Ours Garage*, 536 U.S. at 439. Since then, several courts have " 'on the whole given a broad construction to the safety regulation exception[,]' " contained within the construct of 49 U.S.C. § 14501(c). *United Motorcoach Ass'n, Inc. v. City of Austin*, 851 F.3d 489, 494 (5th Cir. 2017) (quoting *VRC LLC v. City of Dallas*, 460 F.3d 607, 612 (5th Cir. 2006)); *see Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 769 (2d Cir. 1999).

It is not enough, however, for the court to simply consider whether a regulation is reasonably related to safety. Instead, the court "must determine whether, in light of the legislative body's purpose and intent, the regulation is *'genuinely* responsive' to safety concerns." *Loyal Tire*, 445 F.3d at 145 (2d Cir. 2006) (emphasis added) (quoting *Tillison v. City of San Diego*, 406 F.3d 1126, 1129 (9th Cir. 2005) ("[T]he Supreme Court tells us that our focus in a preemption case . . . is whether the purpose and intent of the body passing the law at issue, whether state or municipality, was truly safety.")); *see Ours Garage*, 536 U.S. at 441-42 ("Local

---

words used in different parts of the same act are intended to have the same meaning.").

regulation . . . that is not genuinely responsive to safety concerns garners no exemption from [the] preemption rule."). "In making that determination, [the court] must consider any specific expressions of legislative intent in the statute itself as well as the legislative history, and [the court] must assess any purported safety justifications asserted by the state or municipality in light of the existing record evidence." *Loyal Tire*, 445 F.3d at 145; *see also Auto. Club of New York, Inc. v. Dykstra*, 520 F.3d 210, 214 (2d Cir. 2008). At least one court, however, has "rejected a searching standard 'wherein the court inquires closely into the legitimacy of the municipality's safety concern and ensures that it is not a guise for economic regulation.' " *City of Austin*, 851 F.3d at 494 (quoting *VRC LLC*, 460 F.3d at 612-13).

Based on the record presently before the court, I disagree with the assertion by OurBus that section 346-31 of the City of Ithaca Municipal Code is an impermissible attempt to regulate the schedules of federally-registered motor carriers. Dkt. No. 2-12 at 14. Rather, when considering the legislative history and safety justifications in light of the record evidence, section 346-31 of the City of Ithaca Municipal Code is "genuinely responsive" to the safety concerns of the City. *Loyal Tire*, 445 F.3d at 145.

Although the ordinance itself fails to contain a preamble or "any specific expressions of legislative intent," *Loyal Tire*, 445 F.3d at 145, the legislative history demonstrates that the Common Council intended to address a number of traffic-related issues within the City in March 2001. *See generally* Dkt. No. 30-4. Significantly, in addition to enacting section 346-31, Ordinance 2001-01, *inter alia*, enabled the City's Traffic Engineer to install traffic control devices, designate "safety zones" for pedestrians, and establish bus and taxi stops; set the speed limit for travel within the City and its parks; designated certain streets as being one-way; prohibited U-turns on certain streets; prohibited turns at certain intersections; excluded trucks from certain roadways; and banned twenty-four-hour continuous parking on certain streets. *See generally id.* It is clear that despite the absence of a preamble in the ordinance, the Common Council's intent in enacting Ordinance 2001-01, which includes section 346-31, was to control traffic, eliminate congestion on the City's streets, and ensure the safety of passenger and pedestrian. *See generally* Dkt. No. 30-4.

Having considered the legislative intent in enacting the ordinance, the court is next tasked with assessing "any purported safety justifications asserted by the state or municipality in light of the existing record

evidence." *Loyal Tire*, 445 F.3d at 145. In that respect, there was a significant amount of testimony adduced at the evidentiary hearing with respect to the City's safety concerns surrounding the use of the 131 East Green Street stop, as well as the City's ultimate determination that it would not renew the permit issued to OurBus under the ordinance for that location.

Following the closure of the private bus terminal, the City had three weeks to identify a suitable, alternative location for the Legacy Carriers to utilize for their passengers. Tr. 97-98, 103-04, 171-72, 314. Because this limited timeframe prevented the City from conducting a more formal study, after receiving input from key planning personnel, City officials concluded that 131 East Green Street would be appropriate during a six-month trial period. Tr. 99-100, 109-10, 221-22, 315-22.

It became clear almost immediately, however, that this was an untenable long-term solution. According to Ms. Cornish, particularly during peak times, the area became extremely congested with buses and passengers, leading to a number of safety-related concerns. Tr. 117-20. For example, because the number of buses exceed the available space, some of the buses and other vehicles blocked traffic and emergency vehicle lanes, with some operators unloading luggage in the streets of the

City. Tr. 117-20. In addition, the sheer volume of passengers convening in the area made it difficult for patrons of the mental facility to access its services. Tr. 117-18.

Within several weeks, the City revoked all of the previously issued permits, Tr. 21, and the Common Council proceeded to study the issue extensively. At one meeting, for example, when an alderperson "stressed the importance of having set bus schedules at the beginning of the year vs. the flexibility model proposed so the bus companies can make scheduling changes as needed," another alderperson responded that the "Common Council's role [was] to regulate how many buses can be on the street at the same time, not to set bus schedules." Dkt. No. 30-17 at 4; *see also id*. ("[S]cheduling buses is a means of promoting public safety.").

When the bus companies were invited to re-apply for permits, discussions between OurBus and the City stalled for several weeks, a factor that resulted in the company being the last to apply. During negotiations regarding the permit language, when OurBus indicated its belief that the City was attempting to impermissibly regulate bus schedules in contravention of federal law, the City responded that it was "not exercising any control over OurBus' schedule. Rather, as owner of the

property, the City is managing the effective and safe use of its property." Exh. D-5 at 3.

Although OurBus ultimately applied for, and was granted a permit, the City also determined that the permit would not be renewed. Exh. D-9. Based upon the evidence adduced during the evidentiary hearing, the City's decision to exclude OurBus—instead of the Legacy Carriers—from 131 East Green Street was rational and based upon reasonable considerations of safety. *See* Point II.G, *supra.* For example, when buses were observed to be loading and unloading luggage from the street, exacerbating an already unsafe situation, OurBus was responded that it was unable to assure the City that this would not occur in the future due to its unique status as a broker. Tr. 228-32; Exhs. Exh. D-4, D-18. Moreover, although OurBus did not typically engage the services of more than one motor carrier at a time, the company's fluctuating schedule made it difficult to coordinate and ensure safe operation of the limited space available at 131 East Green Street.

Based on the record presently before the court, I conclude that the City's ordinance is saved from preemption by virtue of 49 U.S.C. § 14501(a)(2) and that, likewise, the ordinance is genuinely responsive to

safety concerns. Accordingly, OurBus has failed to carry its burden of demonstrating a likelihood of success on the merits.

### 2. Irreparable Harm

"Irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.' " *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)); *see Meaney v. Vill. of Johnson City*, No. 10-CV-0070, 2010 WL 1633371, at *9 (N.D.N.Y. Apr. 21, 2010) (McAvoy, J.)*;* 11A Fed. Prac. & Proc. Civ. § 2949 (3d ed.). "To satisfy the irreparable harm requirement, [the p]laintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.' " *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)); *see In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*, No. 14-MC-2542, 2014 WL 12778832, at *4 (S.D.N.Y. Sept. 19, 2014). Although it is true, as OurBus suggests, that where "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of

irreparable injury is necessary," *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984), it is equally true, as the City suggests, that "[l]ost profits alone are not sufficient to show irreparable harm." *Freeplay Music, Inc. v. Verance Corp.*, 80 F. App'x 137, 138 (2d Cir. 2003).

Although OurBus has framed the irreparable harm inquiry as one that involves a deprivation of constitutional rights, it is clear that any injury to OurBus would be in the form of lost profits, goodwill, reputation, or a threat to the continued existence of its business in the City. While under certain circumstances this can constitute irreparable injury, that is not the case here. OurBus has only been operational in the City for a few years, and the court sees no reason why it would be impossible for OurBus to calculate money damages, including lost profits, based on its ticket sales. *Cf. Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (concluding that money damages were inadequate compensation because the plaintiff had only recently begun showing a profit and therefore "lack[ed] a track record from which to extrapolate" damages).

Even if OurBus could demonstrate that it would be irreparably harmed, it has failed to convince the court "that it could not prevent such harm." *Air Transp. Int'l Liab. Co. v. Aerolease Fin. Grp., Inc.*, 993 F. Supp.

118, 123 (D. Conn. 1998) (citing, *inter alia*, *Lanvin, Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 193 (S.D.N.Y. 1990) ("A movant . . . cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm."); *see also American Brands, Inc. v. Playgirl, Inc.*, 498 F.2d 947, 950 (2d Cir. 1974) (affirming the denial of a preliminary injunction because the plaintiff had failed to demonstrate that alternative advertising space was unavailable). Although it is undisputed that real estate in the City is extremely limited, and there was testimony regarding the City's efforts to identify alternative locations for a bus stop for OurBus, there was no testimony with respect to any similar efforts undertaken by OurBus. Indeed, when the subject of relocation was broached during the April 4, 2019 meeting, Mr. Hellman stated that OurBus would not willingly leave the 131 East Green Street location. Tr. 331-32.

Accordingly, I find that plaintiff has failed to demonstrate that it would suffer irreparable harm in the absence of a preliminary injunction.

### 3.   Public Interest

"Regardless of a plaintiff's ability to demonstrate irreparable harm and substantial likelihood of success on the merits, a district court may deny injunctive relief if it is against the public interest." *Flores v. Town of Islip*, No. 18-CV-3549, 2019 WL 2272769, at *36 (E.D.N.Y. May 28, 2019);

*see Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for [sic] the public consequences in employing the extraordinary remedy of injunction."); *360Heros, Inc. v. Mainstreet Am. Assurance Co.*, No. 17-CV-549, 2018 WL 1033283, at *4 (N.D.N.Y. Feb. 21, 2018) (D'Agostino, J.) ("Even if the plaintiff demonstrates irreparable harm and a likelihood of success on the merits, however, the remedy of preliminary injunctive relief may still be withheld if equity so requires."). Accordingly, "[a]n award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999); *see* 11A Fed. Prac. & Proc. Civ. § 2948.4 (3d ed.). In addition, the court "assumes that the acts of a governmental entity are aligned with the interests of the public it serves[.]" *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) (Kahn, J.) (citing *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

Even assuming that OurBus had convinced the court that it would likely succeed on the merits and suffer irreparable harm in the absence of

a preliminary injunction, equity would demand denying the instant motion because it is apparent that the issuance of such relief would disserve the public interest. Despite the dearth of evidence presented at the evidentiary hearing, OurBus has failed to offer evidence that would result in the court departing from the court's assumption that acts of the City were not aligned with the interests of the public it serves. If this court were to issue a preliminary injunction, it would effectively create a regulatory void as to OurBus, and deprive the City of its ability to address serious safety concerns and significant traffic congestion on its streets. *See, e.g.*, *Hafez v. City of Schenectady*, No. 17-CV-0219, 2017 WL 6387692, at *6 (N.D.N.Y. Sept. 11, 2017) (Suddaby, C.J.) ("[T]he Court finds that the preliminary injunction would not be in the public interest because it would impair [d]efendants' efforts to subject landlords to basic accountability measures[.]");*see also New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576, 597 (2d Cir. 1989) (finding no error in the lower court's decision to decline issuing an injunction where, among other reasons, "the public interest militate[d] against granting [the] injunction"); *see generally* Dkt. No. 30-4.

Accordingly, I conclude that the issuance of a preliminary injunction would not serve the interests of the public.

## IV.   SUMMARY AND ORDER

Turning first to irreparable harm, because OurBus has not proven that it has endeavored to locate a suitable alternative site, either along City streets or on private property, for its use as an inter-city bus stop and further because of the availability of an adequate remedy at law, I conclude that it has not carried its burden of demonstrating irreparable harm should an injunction not be issued by the court. Addressing the likelihood of success, I find that the City's regulation and discretion to issue permits for use by operators and carriers as an inter-city bus stop is an exercise of a police power reserved to the states and not preempted by federal law. I further conclude that the decision to allow the legacy carriers to utilize the 131 East Green Street location as a bus stop and to preclude OurBus and, to the extent it was still in business from when the decision was made, Big Red Bullet form using the stop, was rational and based upon reasonable considerations of safety and the distinction between carriers insofar as fixed scheduling is concerned and the sale of tickets by the legacy carriers at the nearby Green Street pharmacy. I further conclude that the mere fact that OurBus was granted a permit to utilize the 131 East Green Street stop before the legacy carriers does not provided a basis to claim seniority and argue against the City's legitimate exercise of

its police powers to terminate its permit. Lastly, based upon the many safety concerns articulated during the hearing, I find that the issuance of a preliminary injunction would not serve the public's interest. Accordingly, it is hereby

ORDERED that plaintiff's motion for a temporary restraining order and preliminary injunction (Dkt. No. 2) is DENIED; and it is further

ORDERED that the clerk of the court serve a copy of this decision and orders upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Date: June 28, 2019
Syracuse, New York